UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14065-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

DION KHAN,

     Defendant.

_____/

## **DEFENDANT'S POSITION PAPER ON SENTENCING**

COMES NOW defendant, Dion Khan, by and through his appointed counsel, Kafahni Nkrumah, pursuant to Federal Rule of Criminal Procedure 32, Local Criminal Rule 88.8, and USSG § 6A1.2(b), and submits the following position with respect to sentencing in this case.

## **SENTENCING POSITION PAPER**

### ***A.     The Offense Circumstances***

Mr. Khan engaged in controlled buys with an undercover Port Saint Lucie police officer on three different occasions, August 15, 2022, August 23, 2022, and September 7, 2022. Mr. Khan was arrested on September 16, 2022, for an unrelated offense. On September 21, 2022, Mr. Khan was interviewed by law enforcement officers regarding the three previously mentioned controlled buys. Mr. Khan freely waived his Miranda rights and spoke with the officers, taking responsibility for his conduct.

On October 20, 2022, a federal grand jury indicted Mr. Khan on a three-count indictment for distribution of a controlled substance (all three counts). On November 1, 2022, a writ of Habeas Corpus ad prosequendum was issued for Mr. Khan and he was initially appeared on the federal indictment on November 4, 2022. On January 11, 2023, Mr. Khan plead guilty, pursuant to a written plea agreement, to all three counts of the indictment. Mr. Khan has fully allocated and accepted responsibility for his conduct.

### B.    Mr. Khan's Personal Circumstances

Mr. Dion Khan is a forty-nine-year-old, Asian American man, born into a loving and close-knit family. Mr. Khan was born in Port of Spain, Trinidad and Tobago and would eventually become an American citizen after his mother relocated to the United States. After relocating to the states, Dion and his sister, was raised by their mother and stepfather in a good home that provided him and his sister with love, care, and all of their material needs being meet [Draft PSR pg. 14, ¶ 54].

In speaking with Ms. Lenoy Bain, Mr. Khan's mother, she states that she, and her family, are simply blindsided with the way Mr. Khan's life has spiraled out of control leading to his awaiting sentencing in federal criminal court. "I want to start by saying that I am not saying this just because I am Dion's mother. I am saying this because Dion was a great son as a child and has been a great person as an adult also. As a child, Dion was a gem! I never had to worry about him, and he never gave me, or his stepfather, any problems growing up."

Ms. Bain goes on to talk about her son as a student.  "Dion was always a good student and once he started school here in this country, he excelled!  He loved school and never wanted to miss a day.  I remember one day when he missed the school bus, instead of coming back home, he walked to school which was a distance from our home.  When I asked him didn't just come home and miss the day, he said that he didn't want to miss any of his classes.  He was 8 years old.  When he first started school, he would be teased by the kids about his accent and being different.  But he never complained to me about it.  I didn't find out until the teacher called me one day and spoke to me about how he was being treated by the other kids.  When I spoke with him about it he said that he never complained about his treatment because, 'mommy, I guess they will just have to get used to me.'

Ms. Bain speaks about when he was in high school.  "Dion would tutor students after school, and he loved helping others.  He especially loved helping students who were from other countries and were having difficulty adjusting to going to school here. He was a member of the school choir and he really worked hard at fine tuning his voice.  His music teacher would always say, 'Dion's little sister, who also attended school with Dion, had a natural tone to her voice but Dion had to work to fine tune his voice and he has become a masterful vocalist.'  Dion graduated from high school with nine letters in the Arts and Music and he graduated in the upper half of his high school class.

After graduating from high school Mr. Khan continued to his education.  He attended West Chester University and majored in music (See draft PSR pg. 17, ¶ 71).

3

In speaking with Ms. Bain, Mr. Khan continued to volunteer and assist others.  While a freshman in college, Mr. Khan received the Kevin Irving Freshman Leadership Award for being part of a group that formed a volunteer tutorial group for detainees at the local jail.  Although Mr. Khan did not complete his college education, leaving school just short of earning his bachelor's degree, Mr. Khan continued to excel as a singer and as a member of several choirs.

In speaking with Ms. Bain, she comments on her son's singing ability.  "Since he began singing, I would always be complemented on how well he sung, by audience members after a performance and by his instructors.  While he was in school, he worked part-time at a local gas station and people in the community who knew us would always approach me and comment on how Dion would be singing opera while working and they felt like he was serenading them.  Dion has been a member of several choirs, the Brevard County Community Choir, The Atlantic Chambers Singers, and he also sung with the Trinity Episcopal Church Choir.  He was also the head of the tenor department at the Vero Beach Community Church, and he has performed at the Henagar Theater.  Dion loves to sing, and I miss hearing him singing.  People who would walk by would stop and listen to him sing and I miss seeing the reactions that he would elicit from them."

Ms. Bain, while lamenting her son's current situation, believes she knows what caused him to spiral into a depressive state and why he sought solace in drugs. "Dion was with his partner for twenty (20) years, and he thought he had found his lifetime partner.  One day, out of the blue, after they had been living together in a house that

Dion bought but was owned by both Dion and his partner because Dion put his partner's name on the deed, Dion's partner came home and told Dion that he was leaving him for someone else, someone they both knew.  But instead of moving out of the home, Dion's ex-partner moved his new lover into their home.  When I asked Dion why he didn't kick them out Dion explained to me that because his former partner was on the deed to the home, he was entitled to stay telling me, 'Mama, the only thing that I can do is deal with what is going on, I am not going to leave my home, it sucks but it is what it is.'"

Mr. Khan's ex-partner moving his new lover into their home was just the beginning of the abuse.  Ms. Bain went on to describe other instances of mental abuse that Mr. Khan's ex-partner, and his new lover, put him through.  "He would tell me that he would come home from work and find his mattress on the living room floor, like he wasn't supposed to stay in a room or even in the house.  On top of that there were always snide remarks made by both his ex-partner and his lover.  After almost a year of the abuse Dion finally moved out of the home and stopped paying the mortgage.  The house was subsequently repossessed, and Dion lost his home."

Ms. Bain goes on to describe how these events changed her son.  "Before all of this happened my son was a happy and caring person, someone who everyone in the family went too for advice and to just talk out problems.  I would always consult with Dion because I knew that he would always give me good advice because he has always had so much empathy for people.  After all of this took place, I could see it in his eyes that he was lost.  One day, while visiting me, we sat on the couch talking about it all

and Dion, with his head in my lap, opened up about how the actions of his ex-partner had destroyed him. I thought he was dealing with it all and I didn't realize how devastating it all was for him and that he resorted to drug use to ease his pain."

"I miss Dion being there for me! I have medical issues and Dion was always there to help take care of me. I was in the hospital during Christmas last year and it nearly destroyed me that he was not there to help me. I depended on him so much and I am lost without him. I am so upset about all that is going on with him and his being locked up, but I try to be strong for him because I know the situation that he is in is worst than what I am dealing with with him not being here. I live on a fixed income and its' difficult on me trying to make sure that I keep some money on his commissary books so he can get the things that he needs, but I love him and he's my son, so I sacrifice to make sure that he is okay."

Mr. Khan is before this court after a plea of guilty to all three counts, pursuant to a plea agreement. He has accepted responsibility for his conduct and realizes that his conduct in this instance offense has upended his family's life and has taken him away from his loved ones and he is regretful for his actions.

Mr. Khan respectfully request this court to take into consideration all the 18 USCA § 3553(a) factors and sentence him to a sentence of 60 months, to be followed by a term of supervised release. Mr. Khan believes that this sentence is sufficient, but not greater than necessary to achieve the purposes of sentencing within 18 USCA § 3553(a). Mr. Khan deserves an opportunity to become a responsible, productive, and law-abiding citizen once again in our community and he believes he can

accomplish this with the assistance of the substance abuse counseling and the mental health counseling that he intends to pursue while incarcerated.

Mr. Khan would like this court to be aware that his life experiences are not being offered to this court as an excuse for his conduct.  It is being offered as mitigation evidence, which United States Supreme Court case law, and statutory authorities clarifies, "… is not being provided as an excuse or justification for engaging in criminal conduct, but rather for the purpose of mitigation as to the length of sentence or type of punishment to be imposed as a result of that criminal conduct." See *Lockett v. Ohio*, 438 U.S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. § 3661 and 21 U.S.C. § 850.[1]

### C. 18 U.S.C. § 3553(a) in considering Mr. Khan' sentence.

The mandate of 18 U.S.C. § 3553(a) is, of course, for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph 2 of that same statute.  In *United States v. Chavez*, 584 F.3d 1354, 1364 (11th Cir. 2009), the Eleventh Circuit summarized the factors that a sentencing court must consider:

> "Post *Booker*, the imposition of a sentence by the district court in a criminal case … involves a two-step process.  First, the district court must still determine the appropriate sentencing range under the guidelines.  This step includes the consideration and application of applicable departures as authorized by the Guidelines or statute. Second, the district court must then consider the various factors

---

[1] Evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurrence).

enumerated in 18 U.S.C. 3553(a) in ultimately arriving at a reasonable sentence.

See also, *United States v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005) ("The § 3553(a) factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the kinds of sentences available; (6) the sentencing guidelines range; (7) pertinent policy statements of the Sentencing Commission; (8) the need to avoid unwanted sentencing disparities…. While the district court must consider these factors in imposing the sentencing…).

In Mr. Khan' case, it is the circumstances of his current offense, the circumstances of his life, and his personal characteristics that justifies a sentence of sixty months. Mr. Khan' has taken full responsibility for his actions, evidenced by his willingness to speak with investigators and admitting to his conduct in the instant offense, soon after his arrest and sparing the government of much needed time and expense by pleading out to the offense.

Mr. Khan's criminal history category is scored at CHC III but a closer look at his criminal history reveals someone whose criminal history clearly reflects the upheaval in his life. His addiction provided much of the motivation for his past crimes and the instant offense. Mr. Khan sold methamphetamine to support his own addiction to meth, or what they call in the streets, "supporting his high." Although he has never before participated in drug treatment and mental health counseling, he

believes that he would greatly benefit from participation in the Bureau of Prisons drug treatment and mental health programs.

It can be said that Mr. Khan's actions in the instant offense apply to those, who in a calculated way, have sold drugs solely for the purpose of making a profit. It can also be said that his actions apply equally to those who sold drugs to support their own addictions. Mr. Khan's addiction, and the fact that he sold drugs to support that addiction, places him on the lower end of this scale, some distance from those who sell drugs solely to make a profit. Given that his chances of succeeding as a responsible member of society will be greatly enhanced by imprisonment and the promise of effective drug treatment that will be available to him in the bureau of prison's residential drug abuse treatment program,[2] the likelihood of Mr. Christian committing new crimes will be greatly reduced.

In speaking with Mr. Khan, he has spoken to counsel about using this period of incarceration to improve himself and seriously start turning his life around, not just for himself but also for his family. "I plan to work as hard as I can, taking as many classes as I can while in prison so I can give myself a chance once I get out.

---

[2]"Inmates are released into RDAP based on their proximity to their release date, to ensure that every inmate who volunteers and is eligible for RDAP received the full course of treatment prior to community release. Inmates in the residential program are housed together, to create a treatment community. Treatment is provided for a minimum of 500 hours, over a 9 to 12-month period. Required RDAP components also include a transitional drug program, when the inmate is returned to general population, and participation in a community-based drug treatment, when the inmate is released to an RRC." U.S. Department of Justice, *Legal Resource Guide to the Federal Bureau of Prisons* (2008) at 23-24, available at: www.bop.gov/news/PDFs?legal_guide.pdf

Being a convicted felon makes life so much more difficult, most employers won't hire you and because of the felonies that I have I am not eligible for most jobs.  Getting what I can out of these classes in the BOP, I hope will benefit me and prepare me for life after incarceration.  I don't blame anyone else for my mistakes, those mistakes are mines alone, but these criminal convictions will make getting a good paying job that much harder, but I understand that and am determined to prepare myself for all of the obstacles I will encounter once I am released."

### D. Mr. Khan's Health and Age in Considering his Sentence.

When balancing the 3553(a) factors, the possible health consequences from incarceration and Mr. Khan's age also cuts in favor of his request for a sentence of sixty-six months, with a period of supervised release to follow.  Mr. Khan suffers from arthritis, diabetes, high blood pressure, high cholesterol, and has seasonal allergies (See draft PSR pg. 16, ¶ 61), and his health will be negatively impacted further from the stressors placed on the body because of incarceration.  In an online article by the Prison Policy Initiative entitled, Research Roundup: Incarceration can cause lasting damage to mental health, the article talks about the debilitating effects of incarceration:

> We often talk about the disturbingly high numbers of people with mental health disorders locked up in prisons and jails. But less attention is paid to the ways in which incarceration itself perpetuates this problem by creating and worsening symptoms of mental illness. Research shows that, while it varies from person to person, incarceration is linked to mood disorders including major depressive disorder and bipolar disorder.
>
> The carceral environment can be inherently damaging to mental health by removing people from society and eliminating meaning and purpose

from their lives. On top of that, the appalling conditions common in prisons and jails — such as overcrowding, solitary confinement, and routine exposure to violence — can have further negative effects. Researchers have even theorized that incarceration can lead to "Post-Incarceration Syndrome," a syndrome similar to PTSD, meaning that even after serving their official sentences, many people continue to suffer the mental effects.[3]

The mental effect of incarceration is not the only possible health consequence of incarceration. Incarceration also takes a physical toll on a person's body. In a study in the Annual Review of Sociology[4] the authors documented a negative relationship between incarceration and a divers set of health conditions. For example, incarceration is associated with high levels of self-reported and the experience of incarceration (exposure) generally has a greater effect on health than the length of incarceration. Aside from general health conditions such as physical functioning, studies in this area have considered various distinct conditions, including infectious disease, cardiovascular disease, and formerly incarcerated person have an elevated risk for these chronic health conditions compared with the general population.[5]

Mr. Khan's mental health difficulties, especially in conjunction with some of the other stressors placed on the body because of incarceration can also justifiably

---

[3] K.R. Quandt and Alexi Jones, Research Roundup: Incarceration can cause lasting damage to mental health, Prison Policy Initiative, (2021), http://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

[4] M. Massoglia and W.A. Pridemore, Incarceration and Health, 41 Annual Review of Sociology, 291-310 (2015), https://doi.org/10.1146/annurev-soc-073014-112326

[5] *Id.*

enter this Court's sentencing decision. *See, e.g., United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (A defendant's age, his prior minimal criminal record, and his medical condition are all valid considerations at sentencing because they relate to the history and characteristics of the defendant); *United States v. Foster*, 2012 WL 2863252, \*5(N.D. Ill. 2012) ("At his original sentencing hearing, the Court found Foster's health concerns and his desire to rehabilitate his life to be mitigating factors taken into account pursuant to Section 3553(a).").

The United States Sentencing Commissions Report on *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), also supports Mr. Khan's request for a lesser sentence. The findings of the Sentencing Commission's report, Figure 14, shows that the reconviction rate, at age of release, is highest among offenders younger than twenty-one, at 48.5%, and those between the ages of twenty-one to twenty-four years old at 48.4% and declined in each subsequent age grouping, with those who are between 50 and 54 years old at time of release being at 15.9%. Figure 15 of the report shows that the reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6) and declined in each subsequent age group, with those between the ages of 50 to 54 years old at 12.8%. Figure 25 compares the rearrest rate for federal and state offenders by age at release. In the 40 years or older age grouping federal offenders were rearrested at a rate of 32.5% while state offenders were

rearrested at a rate of 69.2%.[6]  The report also shows that time to reincarceration expands with age and severity of reincarceration offense declined with age.[7]

Another commission report, *Measuring Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), Ex. 9 shows that those in the 41 to 50 age group, at the time of sentencing, who fall in criminal history category III, have a recidivism rate of 24.5%, as compared to those, for example, in the 21 to 25 years of age bracket who recidivate at a rate of 70.1% and those under age 21 who recidivate at a rate of 60.1%.[8]  Additional research performed by the United States Sentencing Commission in this report also shows that the recidivism rate for those similarly situated to Mr. Khan, whose primary sentencing guideline is 2D1.1 (drug offenses), are least likely to commit further offenses than those convicted under any other sentencing guideline as their primary sentencing guideline.[9]

### E. Other 3553(a) Factors

This Court's obligation under 18 U.S.C. § 3553(a)(2) to consider carefully, the need for Mr. Khan' sentence to "reflect the seriousness of the offense; to promote

---

[6] *Id*. at page 27

[7] The Effects of Aging on Recidivism Among Federal Offenders (Published Dec. 7th, 2017) can be found at: www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders , at page 23.

[8] The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

[9] The Sentencing Commission's report, including Exhibit 11, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2).

Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See United States v. C. R.*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be proportional to the defendant's crime.  A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law); *see also United States v. Rogers*, 960 F.2d 1501 (10th Cir. 1992) ( A sentence must be proportionate to the crime committed, and if the sentence is so disproportionate to the crime as to shock the moral sense of the community, the sentence is impermissible).  There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491 (N.D. Ohio 2012) (While a five-year mandatory prison term may be less cruel than life in prison, as applied in cases like this one, it may well constitute "cruel and unusual punishment.")

In *United States v. Williams*, 481 F. Supp.2d 1298, 1304 (M.D. Fla. 2007) Judge Presnell, recognized that the 262 to 327 months' sentence called for by the career

offender guidelines in that case "would not provide just punishment." He went on to say that such a sentence "offends the very notion of justice." In considering deterrence, Judge Presnell, echoing the proportionality concern of others, stated that "it seems appropriate to consider the deterrence factor in light of the seriousness of the offense, the deterrent effect of a harsh sentence should be reserved for those serious crimes where society's need for protection is the greatest." *Id.* at 1304.

Mr. Khan is not facing sentencing under the career offender guidelines but the sentence that he is facing is a significant sentence, nonetheless. And in urging this court to consider a lesser sentence Mr. Khan does not intend to minimize the nature of the instant offense or his knowing participation in that offense. Nonetheless, Mr. Khan urges this Court, while considering deterrence, to also consider the fact that consideration must also be given to the concept of proportionality.

Furthermore, given the disparity between the longest sentence Mr. Khan has been sentenced to, twelve months, compared to the recommended guideline range of nine to ten years and five months, a lesser sentence in his case would be in accordance with the tenants of § 3553(a). Mr. Khan realizes that this Court is well versed in the goals of sentencing set forth in 18 U.S.C. § 3553 and in no way is attempting to lecture this court about proportionality but Mr. Khan's age, his personal circumstances, and the fact that his offense was largely the product of clouded thinking due to his addiction, suggests a reduced possibility of recidivism and are relevant to the need to

promote respect for the law.[10]   Thus, "mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases, are now potentially relevant in every case." *United States v. Glover*, 431 F.3d 744, 753 (11th Cir. 2005) quoting *United States v. McBride*, 434 F.3d 470, 475 (6th Cir. 2006).

### F.  The Possibly Effects of Trauma on Mr. Khan's Health

Posttraumatic stress disorder (PTSD) is a prevalent cause of distress and disability in the general population.[11]   According to national epidemiologic studies, the prevalence of PTSD ranges between $8-12\%$ in the general population.[12]   Trauma exposure appears to be high in minority populations, especially African-Americans, among those living in stressful urban environments.[13]   Breslau et al. reported

---

[10] Just, however, as a sentence that is too short may fail to reflect the seriousness of the offense, promote respect for the law, or provide just punishment, so will a sentence that is excessively harsh.  *See, e.g., U.S. v. Stern*, 590 F. Supp.2d 945, 956 (N.D. Ohio 2008) (A sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing); *United States v. Ontiveros*, 07-CR-333, 2008 U.S. Dist. LEXIS 58774, *6 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law]"); *United States v. Zavala*, No. 07-14851, 2008 U.S. App. LEXIS 24168, *8-9 (11th Cir. Nov. 25, 2008) ("[A]ny higher sentence would promote disrespect for the law.") (quoting the district court).

[11] Kessler RC. *Posttraumatic stress disorder: The burden to the individual and to society.* J. Clin Psychiatry. 2006; 61 (suppl 5): 4-14.

[12] Breslau N, Kessler RC, Chilcoat HD, et. Al., Trauma and posttraumatic stress disorders in the community: the 1996 Detriot Area Survey of Trauma. Arch Gen Psychiatry. 1998;55(7): 626-632.

[13] Id.

increased rates of trauma exposure in non-whites compared with whites for assaultive violence (55% vs. 32%) and learning about others experiencing trauma (69% vs. 61%). The article goes on to state that:

> "Like depression, alcohol, and substance abuse use disorders are common in individuals with significant trauma exposure,[14] especially in males. African Americans exposed to traumatic experiences are more likely to be at increased risk for developing alcohol and/or substance problems as well."

Trauma is a response to an intensely stressful event(s) or situations. The effects can be long-lasting…and can happen at any age having lasting effects on your physical and mental well-being. Each person's experience is unique, but there are common cause, and many people share some symptoms of post-traumatic stress, like anxiety, flashbacks, and sleep disruption.[15] Trauma is typically associated with significant events such as physical or sexual assault, violence, or accidents. But it can also involve responses to repeated events, like ongoing emotional abuse or childhood neglect.[16] Trauma can affect many areas of your life, including your emotional, social, and physical well-being. During extreme stress, the body and mind become overwhelmed, engaging the nervous system's fight, flight, or freeze response.[17] Common symptoms after trauma include: intrusive thoughts, including

---

[14] Id.

[15] Gina Ryder; medically reviewed by Debra Rose Wilson, Ph.D.', MSN, R.N., IBCLC, AHN-BC, CHT, What is Trauma, PsychCentral (2022), http://Psychcentral.com/health/what-is-trauma, (last visited 6/5/22)

[16] *Id.*

[17] *Id.*

flashbacks and nightmares; avoiding things that remind you of the trauma, including people, places, or objects; hypervigilance, or being very aware of danger; being easily statled or "jumpy;" being activated by triggers that remind you of the trauma, whether consciously or subconsciously; changes in how you see yourself such as believing you are a bad person or feeling excess guilt or shame; and/or a small window of tolerance, meaning you feel overwhelmed easily or have difficulty controlling your emotions.[18]

According to the Sidran Institute, trauma is pervasive in the United States with about 70% of U.S. adults having experienced a traumatic event at least once…with up to 20% of these people meeting the criteria for PTSD…The  risk of developing PTSD varies based on the trauma, with the risk being especially high after rape (49%), physical assault (around 32%), and other sexual assault (around 24%).[19]

Mr. Khan has not been diagnosed with PTSD, but he was diagnosed with depression and anxiety in approximately 2012 or 2013 (see draft PSR pg. 16, ¶ 63). More troubling is his self-reporting of sexual abuse while he was incarcerated at the Brevard County Jail in 2018.  Being back in an incarceration setting has the possibility of Mr. Khan reliving the trauma and being hypersensitive to his surroundings, even more so than the hyperattention those who are incarcerated experience because of the inherent danger of prisons themselves.  Reliving the trauma of his assault has the possibility of sensitizing the hypothalamic-pituitary-

---

[18] *Id.*

[19] *Id.*

18

adrenal (HPA) axis, which is the body's central stress response system. You can think of this as the juncture of our central nervous system and endocrine system, which makes us more reactive to stress and more likely to increase the stress hormone cortisol… Unfortunately, Cortisol can be toxic when it is chronically high-ultimately leading to increased risks of health conditions such as depression or heart disease.[20]

### *Conclusion*

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a). Mr. Khan respectfully requests this Court to follow that tradition and impose a sentence of sixty months to be followed by a term of supervised release. This sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in § 3553(a).

---

[20] Rubin Khoddam, Ph.D, How Trauma Affects The Body, Psychology Today, March 3, 2021, http://www.psychologytoday.com/us/blog/the-addiction-connection/202103/how-trauma-affects-the-body

<u>**Requests for Recommendations**</u>

Mr. Khan respectfully requests this Honorable Court to recommend that he be housed in a facility as close to the Southern District of Florida as possible so that it will be easier to maintain family visitation.  Mr. Khan also respectfully request that this Court recommend the RDAP program and mental health counseling.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By:      *s/Kafahni Nkrumah*
        Kafahni Nkrumah
        Assistant Federal Public Defender
        Special Bar ID #A5502967
        109 North Second Street
        Fort Pierce, Florida 34950
        Tel:  772-489-2123
        E-Mail: Kafahni_Nkrumah@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on June 13, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By:   <u>*s/Kafahni Nkrumah*</u>
Kafahni Nkrumah